In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4063

Gamba M. Rastafari, a/k/a
Gregory Rouster,

Petitioner-Appellant,

v.

Rondle Anderson,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 99 C 608--Allen Sharp, Judge.

Argued May 18, 2001--Decided January 22, 2002

   Before Bauer, Easterbrook, and Kanne,
Circuit Judges.

   Kanne, Circuit Judge.  Petitioner, Gamba
Rastafari, a/k/a Gregory Rouster
("Rouster"), was convicted of two counts
of felony murder in Indiana state court
after a joint jury trial with two co-
defendants. At the jury's recommendation,
the trial judge sentenced Rouster to
death. After exhausting his state
remedies, Rouster filed a petition for a
writ of habeas corpus in the Northern
District of Indiana. Rouster now appeals
the denial of his habeas petition,
alleging the following: 1) that his trial
counsel was ineffective for failing to
move for severance prior to trial; 2)
that his trial counsel was ineffective
for failing to move for severance prior
to the penalty phase; and 3) that his
trial counsel was ineffective for failing
to present expert testimony on self-
defense. For the following reasons, we
affirm.

I.  Facts

A.  Background

   John and Henrietta Rease, an elderly
couple who lived in Gary, Indiana, cared
for, fed, and housed foster children at
their home at 2430 Jennings Street in

exchange for $160 per month per child. One such foster child was Rouster, who lived with the Reases from November 1985 until his eighteenth birthday on February 7, 1986. On August 12, 1986, the Reases were robbed and shot to death in their home. Police arrested Rouster, Darnell Williams, Theresa Newsome, and Edwin Taylor and charged them each by information with two counts of felony murder. Ind. Code sec. 35-42-1-1(2)./1 Further, the State sought the death penalty against Rouster and Williams pursuant to Ind. Code sec. 35-50-2-9, Indiana's death penalty statute.

At the Initial Hearing, public defender Robert Lewis was appointed to represent Rouster, and Rouster entered a plea of not guilty on both counts. On January 7, 1987, Noah Holcomb was appointed as additional counsel to aid Lewis in representing Rouster. On February 3, 1987, Williams filed a motion for severance, asking the court to "sever him from the trial of the remainder of the defendants herein . . . [because] his interests, rights and his defenses hereto will be prejudiced if he is tried with the remainder of the defendants herein." Williams' motion to sever was denied, and Rouster never filed a motion to sever.

B. The Crimes

Rouster's joint trial with Williams and Newsome/2 began on February 10, 1987, at which time Rouster's counsel waived opening statement. Neither Rouster nor Williams testified, but the following evidence was adduced at trial through direct and cross-examination of the State's witnesses and through the admission of 70 trial exhibits consisting of physical evidence and of photographs.

Jack Baumer, the child welfare caseworker who placed Rouster with the Reases, testified that he saw Rouster at a drug store in Gary, Indiana on August 12, 1986. Rouster asked Baumer if the Reases received a clothing allowance on his behalf during the time Rouster lived with them. Baumer responded that the Reases received a clothing allowance of about five to six dollars per month, and Rouster told him that he had never received any clothing from the Reases. According to Baumer, Rouster ended the conversation by saying that he was going

to get his money from the Reases.

Derrick Bryant, a seventeen-year-old foster child who lived with the Reases, testified that on August 12, 1986, he was in the living room of the Rease house. Through a window in the living room, Bryant saw Rouster, Williams, Newsome, and Kim Toney ("Four")/3 walking towards the Rease house at around 9:00 p.m. Bryant testified that while walking toward the Rease house, Rouster wasdrinking from a 40-ounce bottle of Private Label malt liquor. The Four entered the Rease house and sat down in the living room, and Rouster and Henrietta Rease went into Rouster's former bedroom to talk./4 Bryant testified that while he was in the living room, he heard Rouster state that Baumer had told him that he was supposed to get some money from the Reases. Bryant also testified that Henrietta Rease responded that she did not know anything about that money. Bryant stated that Rouster and Henrietta Rease returned to the living room, at which time Bryant then left the living room and went to a room at the back of the house.

From the back room, Bryant heard Henrietta Rease ask the Four to leave the house. Bryant testified that he then heard Williams say, "I won't let her, she's doing nothing but gypping you out of the money." Bryant then heard a gunshot and someone running through the backyard. He testified that the gunshot sounded like it was fired outside of the Rease house. Bryant then went upstairs to hide in the attic. While in the attic, he heard a conversation take place outside between Williams, Rouster, and Edwin Taylor, another foster child living with the Reases. According to Bryant, Taylor said, "you all have guns, you all go take the money." Bryant stated that Rouster asked Taylor where the Reases kept their money, to which Taylor responded, "it's on the dresser." Bryant then testified that he heard Rouster say, "let's go rob them."

Bryant ran downstairs to warn the Reases, but when he saw Rouster coming into the Rease house through the front door, he hid behind a stairway. He then heard Rouster tell Henrietta Rease, "I know how to act now and I don't need us to go through this because I got a gun and you got a gun." Bryant heard Williams

tell Henrietta Rease to get down on the floor and heard Rouster demand to be told where the money was. Next, Bryant heard Rouster say, "bring both of them back here," and Bryant heard a noise that sounded like someone falling into a wall. Because he was hiding behind the stairs, Bryant could not determine where in the house this activity took place. Bryant testified that Williams then said, "it's your time." Bryant then heard Rouster say, "waste them." Bryant stated that Henrietta Rease asked Rouster, "Greg, why are you doing this?" to which Rouster responded, "my name ain't Greg." Bryant then heard a gunshot, followed by someone entering the Rease house through a side-door in the kitchen. The next noise that Bryant heard sounded like money falling on the kitchen floor. Bryant heard more gunshots coming from inside of the house, at which time he ran out of the back door of the house. Bryant testified that he then flagged down a police car and told the police to come to the Rease house. Finally, Bryant testified that he knew that the Reases kept at least one pellet gun in the house, and that Taylor told him that Henrietta Rease kept a gun by her bed.

Fourteen-year-old Eugene Powell testified that at around 8:30 or 9:00 p.m. on August 12, 1986, he was standing outside of his house at 2423 Jennings Street (across the street and one house over from the Rease House) with friends Jamal Pope, Demond Ligon, Jimmy Gray, and others ("Group"). Powell saw Rouster, Newsome, a young man, and a young woman walking towards the Rease House. Powell had known Rouster and Newsome from the time that Rouster lived with the Reases, but did not know the other young man. Powell testified that he saw Rouster and Newsome enter the Rease house, while the other two stayed outside. The Group walked to the corner of Jennings Street and 25th Avenue, and then turned around and began walking down Jennings Street towards the Rease house. The Group continued walking, and when they were across the street from the house on 2462 Jennings Street, Powell heard a noise that sounded like two firecrackers coming from inside the Rease house. When the Group reached Gray's house (directly across the street from the Rease house), Powell saw the young man he did not know looking for something on the ground in

front of the Rease house, using a cigarette lighter for illumination. Powell then saw Taylor running down Jennings Street, and the Group moved to Powell's front yard. Powell then testified that he saw Rouster exit the Rease house and enter the Reases' garage with the young man. At that point, Powell and Ligon began to walk up the Reases' driveway, but when they heard Rouster say "who's up in here, we'll shoot," they turned around and went back across the street to Powell's house.

The Group then began to walk down Jennings Street away from the Rease house again, and when they were two houses down from Powell's, Powell heard three more firecracker sounds. Powell then saw the shadow of a person in the living room of the Rease house. After hearing two more firecracker sounds, Powell, Pope, and Ligon went to Ligon's house to call Powell's father. A few minutes later, Powell and Pope started walking towards Powell's house. Powell saw Rouster and Newsome in the Reases' driveway and heard Rouster ask Newsome if she still loved him. Powell and Pope then started running towards Powell's father's car, which was parked in Powell's driveway. Powell testified that while running, he heard Rouster tell Newsome, "I killed the motherfuckers." Powell and Pope then got into Powell's father's car, and Powell saw a police car pull up to where Rouster and Newsome were talking, and saw Rouster pointing down the street. The police car pulled away and stopped at a different house down the block. As Powell, Pope, and Powell's father drove away, Powell heard another firecracker sound while Rouster and Newsome were still in the Reases' driveway.

Pope, Ligon, and Gray all testified and corroborated Powell's testimony. Ligon added that Rouster was wearing a white shirt and a black hat that night, and Gray added that he saw Rouster drinking from a 40-ounce bottle of Private Label malt liquor when Rouster was first walking up Jennings Street towards the Rease house.

Lelia Gray, Jimmy's mother, testified that after hearing a lot of noise coming from the Rease house, she looked out of the window of her house, which was directly across the street from the Rease

house, and saw two young men wrestling in the Reases' front yard. One of the young men wore a white shirt and Ms. Gray heard one of them shout that he "wanted his share." Ms. Gray then saw a young woman wearing all white clothing ask one of the young men for bus fare. From her front yard, Ms. Gray saw the two young men enter the Rease house and saw that the young man in the white shirt had a gun in his back pocket. After the young men entered the Rease house, she heard gunfire. In addition, she saw two flashes inside of the Rease house, which she described as "light flashing from [the] firing of a gun"--one in the living room and one in the front bedroom. She then saw the young man in the white shirt talking to the young woman in white on the Reases' driveway, telling her that he "killed the motherfuckers." Ms. Gray also heard the young woman ask the young man, "why did you do that?" Ms. Gray then saw a police car pull in front of the Rease house and saw the young man in the white shirt tell the police that the disturbance was down the street. Ms. Gray then testified that she saw the young man in the white shirt and the young woman in white walk behind the outside of the Rease house, and that she then heard one more gunshot.

Gloria Williams, the Reases' next-door neighbor, testified that on the night of August 12, 1986, she heard screams and a noise that sounded "like a hammer hitting aluminum siding" coming from inside the Rease house. She heard someone inside of the Rease house yell, "Get it. You know where it is. Go get it." Also, Ms. Williams testified that she could see inside of the Reases' bedroom from her second-floor window, and that she saw objects being tossed around the room. However, someone then closed the shade in the Reases' bedroom. After hearing more noises that sounded like gunshots from the Rease house, Ms. Williams called the police. She then noticed a young man and young woman arguing in the Reases' front yard. The young man told the young woman, "you don't love me," and she replied, "yes I do. You know I love you." Ms. Williams testified that the voice of the young man who was arguing with the young woman in the front yard was the same voice that she heard yelling in the Rease house.

## C.  The Arrest

Officer Rita Dorsey of the Gary Police Department testified that she and her partner had been dispatched to the Reases' neighborhood because of reports of gunfire in the area. As she drove down Jennings Street, Officer Dorsey saw two black youths--one male and one female--talking and asked them where the disturbance was. The young woman approached the police car and told Officer Dorsey that there was no disturbance at that location and that maybe there was a disturbance at a different house down the street. After questioning one of the Reases' neighbors, Officer Dorsey heard a gunshot. She and her partner returned to their patrol car and drove towards the direction of the gunshot. The officers were flagged down by Bryant, who took them to the Rease house. Officer Dorsey and her partner entered the Rease house and found the Reases' bodies on the floor of a bedroom.

Gary bus driver Donna Thomas testified that at 8:05 p.m. on August 12, 1986, two young women and two young men got onto her bus at 21st Avenue and Broadway. She identified Rouster as one of the young men and Newsome as one of the young women, and testified that Rouster was wearing a white shirt and a black hat. Thomas testified that Rouster had a bottle wrapped in a paper bag with him. She also stated that Rouster smelled strongly of "intoxicants." Thomas testified that at around 8:15 p.m., the Four departed the bus at 21st Avenue and Hendricks. Thomas then stated that shortly after 9:20 p.m., Rouster and Newsome ran across 21st Avenue and then boarded her bus at 21st Avenue and Chase. They paid their bus fare with change and asked Thomas if they "could ride around." Thomas testified that as the bus crossed 25th Avenue and Chase, she saw an Indiana State Police car and noticed that Rouster and Newsome crouched down in their seats. Rouster and Newsome exited the bus at 21st Avenue and Broadway, where another bus whose route went down Broadway to 41st Avenue was idling.

Indiana State Trooper Rodney Means testified that while in his patrol car on the evening of August 12, 1986, he saw a young man and a young woman, who he later identified as Rouster and Newsome,

running towards a bus on 21st Avenue. He then saw them board the bus at 21st Avenue and Broadway. Rouster and Newsome matched the description of two of the youths involved in the shootings at the Rease house, and therefore, Officer Means followed the bus. When Rouster and Newsome got off the bus at 41st Avenue and Broadway, Officer Means got out of his patrol car, approached them, and questioned them. Rouster and Newsome told him inconsistent stories about where they boarded the bus. Newsome also told Officer Means not to listen to Rouster because he was high and had been drinking. Officer Means testified that Rouster appeared intoxicated and that his eyes were bloodshot. Next, Officer Means testified that he asked Rouster what the bulge in his shirt pocket was, to which he answered "bullets" or "ammunition." Rouster then handed about twenty bullets to Officer Means. Officer Means then noticed several red spots that looked like blood stains on the back of Rouster's white shirt.

Indiana State Trooper Al Brown testified that on August 12, 1986, he went to 41st Avenue and Broadway to assist Officer Means. Officer Brown arrived there immediately after Rouster had handed the bullets to Officer Means. Officer Brown examined the bullets and determined that they were .30 caliber bullets. Officer Brown then testified that he read Rouster and Newsome their Miranda rights and arrested them both. He also noticed "red splotches" on the back of Rouster's white shirt. Officer Brown then transported Newsome to the Gary Police Department, and Officer Means transported Rouster to the Gary Police Department. At the Police Department, Officer Brown searched Newsome's handbag and discovered that it contained, among other things, several loose coins.

Lake County Police Officer Timothy Lukasik testified that at approximately 9:45 p.m. on August 12, 1986, he began to search the area around the Rease house in order to ascertain possible suspects. In front of 2530 Chase Street, which was about three blocks away from the Rease house, Officer Lukasik saw a young man that matched Williams's description. After apprehending the suspect, Officer Lukasik found a black pouch on him and took him to the Gary Police Department.

Officer Lukansik testified that the black pouch he found on the suspect contained a gold watch,/5 $232.00, a billfold, a J.C. Penny credit card, and .30 caliber ammunition. In court, Officer Lukansik identified the suspect as Williams.

D. The Investigation

Lake County crime technician Ronald Lach testified that on August 12, 1986, he searched the Rease house for evidence. Lach found a live .30 caliber cartridge case on the floor outside of the door to the Reases' bedroom. Lach then opened the door to the bedroom and saw John Rease lying on the floor, with his knees bent. Lach then saw Henrietta Rease lying wedged between the bed and dresser with her head resting on an open drawer of the nightstand. Lach testified that the room was "ransacked" and that the two bodies were covered with clothes from the dresser drawers.

Lach found live .30 caliber ammunition in the doorway going into the bedroom and two live .30 caliber rounds next to John Rease's leg. Lach also found two fired .32 caliber cartridge cases and two or three live rounds of .22 caliber bullets lying on the floor of the bedroom. He also found two boxes of ammunition on the bed's headboard: Remington .32 caliber Smith & Wesson live rounds and Western X .25 caliber automatic live rounds. He found two other boxes of ammunition on the nightstand: Winchester Super Western .38 caliber live rounds and Remington .32 caliber Smith & Wesson live rounds. Next, Lach testified that he found a wad of money behind the corner of the dresser and coins lying on the floor. He also saw several apparent bullet holes in the Rease house: one in the bedroom wall, one on the nightstand, and one on the side of the refrigerator. Additionally, Lach found a .22 caliber weapon with three fired rounds in the cylinder and a B.B. or pellet pistol in the house.

Further, Lach testified that in the early morning hours of August 13, 1986, he went to the Gary City jail to observe Rouster. Lach noticed red drops on the back of Rouster's white vest and t-shirt. Lach also found several red drops on Rouster's shorts, white tube socks, and gym shoes.

Kimberly Epperson, a forensic serologist employed by the Indiana State Police Department, testified that the blood found on Rouster's vest, socks, and gym shoes was consistent with the blood type of John Rease, but not with that of Henrietta Rease, Newsome, Taylor, Williams, or Rouster. Epperson also testified that the blood found on Rouster's t-shirt and shorts was consistent with the blood type of either Henrietta or John Rease or with that of Rouster, but not consistent with the blood type of Newsome, Taylor, or Williams.

Crime technician Lach finally testified that he returned to the Rease house on August 19, 1986, at which time he found two more rounds of .22 caliber live ammunition and three fired .32 caliber cartridge cases in the bedroom. He then searched the weeds behind the house and found a .32 caliber revolver with one fired .32 caliber cartridge case in the cylinder.

Sarvind Kakodar, a pathologist for the Lake County Coroner's Office, testified that he performed the Reases' autopsies. Dr. Kakodar testified that there was a gunshot entrance wound above John Rease's collarbone and that he recovered the bullet that caused this wound from John Rease's back. He also testified that this wound damaged John Rease's lung, and that John Rease's cause of death was "due to a laceration of the right lung." Dr. Kakodar also testified that Henrietta Rease had three bullet entrance wounds: one that entered the skull cavity through the right eye, one at the "lateral end of the left eyelobe," and one in the abdominal area. Dr. Kakodar testified that Henrietta Rease's cause of death was "due to laceration of the brain due to two gunshot wounds of the head."

Jay Gauthier, a firearms examiner for the Lake County Crime Lab, testified that the bullet recovered from John Rease's back was fired by the .32 caliber gun that Lach found behind the Rease house. Further, Gauthier testified that the same gun fired the bullet that was recovered from Henrietta Rease's abdomen. Gauthier then testified that one of the bullets recovered from Henrietta Rease's head may have come from the .22 caliber gun that Lach found in the Rease house./6

E.  Defendants' Case

Defendants' case consisted of calling four witnesses. Theresa Newsome testified that on the evening of August 12, 1986, the Four were at her home, when Rouster asked if they wanted to accompany him to the Rease house. Newsome claimed that Rouster said he "wanted to be with some friends." The Four then left Newsome's house and boarded a bus at 41st Avenue and Johnson Street. At Broadway and 24th Avenue, Rouster and Williams got off the bus, bought one 40-ounce bottle of malt liquor each, and re-boarded the bus several minutes later with the beer bottles wrapped in paper bags. Newsome testified that Rouster continued to drink his beer the entire bus ride. When the Four got off the bus, they walked down Jennings Street, entered the Rease house, and sat down in the living room with Henrietta Rease, John Rease, and Bryant. Newsome testified that Rouster and Henrietta Rease then went into a back room to talk, where they "were talking loud." After several minutes, Newsome, Toney, and maybe Williams (Newsome testified that she could not remember) left the house and walked a few feet down Jennings Street.

Newsome then heard two gunshots that sounded as if they were fired from outside the front of the Rease house. Although she was not wearing her glasses, at the time she heard the first gunshot, she also saw Rouster standing with his arms up in the air in the front hall of the Rease house. One of the neighborhood children told Newsome that Rouster had a gun, and Toney told that child to call the police. Newsome and Toney then went back into the Rease house and saw Rouster, Williams, and the Reases talking in the living room. Newsome asked Henrietta Rease how she was doing, and she replied that she was doing fine. After telling their boyfriends that they were ready to go, Newsome and Toney left the Rease house, where Rouster and Williams remained.

Newsome and Toney walked to the bus stop on 24th Avenue, at which point Newsome realized she had no money for bus fare. Newsome then started to return to the Rease house to ask Rouster for some money. As she approached the Rease house,

she saw Rouster in the front yard of the house. She asked him for bus fare, and he told her to go home. Newsome then testified that Rouster told her that "he killed the motherfuckers" and asked her, "do you love me?" Newsome did not see Williams and did not hear any gunshots. Further, Newsome stated that she did not see Rouster with a gun that entire night. Newsome then testified that a police car pulled up to the Rease house, and that she and Rouster approached the car and that Rouster told the police officers that the disturbance was down the street. Newsome also testified that Rouster gave her some money from a purse that he had taken from the Rease house. After receiving the money, Newsome stated that she and Rouster boarded a bus. Finally, Newsome testified that she and Rouster were apprehended by the police when they got off the bus at 41st Avenue and Broadway.

Williams called two witnesses. First, he called an employee of the Public Defender's Office to authenticate some photographs taken of the Rease house. Then, he called his and Newsome's mother, Shirley Williams, who testified that Williams had possessed the black pouch and the items therein before August 12, 1986. Rouster called one witness, Officer Means, who testified that while at the Gary Police Department, he searched Rouster and found some money on him. He testified that the bills and coins that he found on Rouster totaled approximately twenty dollars.

For the most part, Rouster's trial strategy consisted of cross-examining the State's witnesses, seeking to establish the following facts: 1) that Rouster was outside of the Rease house when at least one gunshot was fired; 2) that Rouster was intoxicated on the night of August 12, 1986; 3) that the Reases kept guns in their house; 4) that no one except Ms. Gray saw Rouster with a gun that night; and 5) in any event, no one saw who shot the Reases. Similarly, Williams' strategy was to establish the following facts through cross-examining the State's witnesses: 1) that he was outside of the Rease house when some of the shots were fired; 2) that no one saw him with a gun that night; and 3) that no one saw who shot the Reases. Further, both Rouster and Williams attempted to impeach the

State's witnesses in order to attack their credibility.

## F. Closing Arguments

During closing arguments, Rouster and Williams began to accuse each other for the first time. Before closing arguments, the trial judge informed the parties that each defendant had forty-five minutes to address the jury. Newsome was to argue first, then Williams, and then Rouster. However, because Rouster was to go last, the trial judge informed the parties that if he perceived that Rouster had "turned on" his co-defendants, he would allow each co-defendant an additional fifteen minutes to rebut Rouster's contentions. He would signal his intention to allow this additional time by placing his eyeglasses on the bench during Rouster's argument. If that happened, then Rouster would also be given the opportunity to extend his argument by fifteen minutes, so that each co-defendant would be allotted an equal amount of time (one hour) for final argument.

Following the State's and Newsome's summations, Williams' counsel told the jury that Rouster "wanted to settle the score" with the Reases and that Rouster had gone "berserk." He also argued that the State had not proved that Williams was guilty of felony murder "beyond areasonable doubt." Rouster's counsel countered in his closing argument that "the real maniac was Darnell Williams." He argued that because Williams was twenty years-old and Rouster only eighteen on August 12, 1986, Williams was the ringleader and driving force behind the murders. He also argued that the police only found drops of blood on the back of Rouster's vest and shirt, and that this was evidence that he was facing away from the Reases when someone else shot them. In response, the trial judge placed his glasses on the bench, and each defendant received an additional fifteen minutes of argument. In his additional time, Williams' counsel argued that the police also found blood on Rouster's shorts, socks and shoes, so that it is unclear whether he was facing away from the Reases when they were shot. Newsome's counsel also argued in his additional time that Newsome received the money that the police found on her "from Greg [Rouster], after he had told her [the

Reases] were dead."

G.  Sentencing

The jury found Rouster and Williams guilty of two counts of felony murder and acquitted Newsome on both counts. At the joint penalty phase ("Phase II"), which began the next day in front of the same jury, the State sought the death penalty pursuant to Ind. Code sec. 35-50-2-9. That statute provided that the State could seek the death penalty against a defendant convicted of murder if the State proved beyond a reasonable doubt one of the following aggravating factors: that the "defendant committed murder by intentionally killing the victim while committing or attempting to commit" robbery or that the "defendant has been convicted of another murder." Id. at sec.sec. 35-50-2-9(b)(1) and (7). In this case, the State alleged that at least one of the following aggravating factors was present: 1) that Rouster and Williams intentionally killed John Rease while committing or attempting to commit a robbery, 2) that Rouster and Williams intentionally killed Henrietta Rease while committing or attempting to commit a robbery, or 3) that Rouster and Williams had been convicted of the murder of John Rease and Henrietta Rease.

The Indiana death penalty statute also provided that the defendant could present evidence pertaining to one of the following mitigating circumstances: 1) the defendant had no significant history of prior criminal conduct; 2) the defendant was under the influence of extreme mental or emotional disturbance; 3) the victim was a participant in, or consented to, the defendant's conduct; 4) the defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor; 5) the defendant acted under the substantial domination of another person; 6) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication; 7) any other circumstances appropriate for consideration./7 See id. at sec. 35-50-2-9(c) (1987). The statute provided that the jury could recommend the death penalty, see Ind. Code sec. 35-50-2-9(e),

only after it had found that: 1) the state had proved beyond a reasonable doubt that at least one of the aggravating circumstances existed and 2) any mitigating circumstances that existed were outweighed by the aggravating circumstance(s)./8 Id. at sec. 35-50-2-9(k). The judge would then make the final determination about the appropriate sentence after considering the jury's recommendation and the standards elucidated in Ind. Code Section 35-50-2-9(k). Id. at sec. 35-50-2-9(e).

In Phase II, Rouster once again waived opening statement. The State then called Taylor, who testified that after the Four entered the Rease house, Rouster, Williams, and Henrietta Rease went into a back room to talk. Taylor heard Williams tell Henrietta Rease, "you better get Greg [Rouster] his fucking money." Everyone returned to the living room, and Henrietta Rease asked Taylor to take Rouster and Williams outside. Taylor then saw Rouster pull out a gun that was hidden in his vest, and Taylor ran out of the house. While next door to the Rease house, Taylor testified that he saw Rouster, who was on the sidewalk outside of the Rease house, fire his gun twice at the living room window. After Taylor ran to the back of the Rease house and hid behind a shed, he heard Williams say, "Greg [Rouster], somebody in back," and then Rouster say, "come on out, I'm going to shoot." After Taylor came out from his hiding spot, Williams took the gun from Rouster, pointed it at Taylor, and asked him where the Reases kept their money. Taylor answered, at which point Rouster told Williams to leave Taylor alone. Taylor then said that Williams dropped the gun in the yard and started looking for it, using a lighter for illumination. Taylor then ran to his friend's house to call the police.

Taylor also identified the .22 caliber gun found at the Rease house as the gun that Rouster and Williams had brandished and the .32 caliber gun found behind the house as the Reases' gun. In addition, Taylor testified that both Williams and Rouster appeared drunk that night. Finally, he testified that about two or three weeks prior to August 12, 1986, Rouster told Taylor over the telephone that he was going to rob the Reases. In addition, the State also presented

evidence that in 1982, Rouster had been adjudicated as a delinquent for two counts of burglary and that Williams, but not Rouster, had previously participated in a robbery similar to the one committed against the Reases.

Rouster's evidence during Phase II consisted of the testimony of his welfare caseworkers and of his welfare file, which revealed that Rouster had been abandoned at birth by his fourteen-year-old prostitute mother. The evidence also showed that Rouster had lived in a number of foster homes and institutional placements prior to his placement with the Reases. Further, Rouster was tested several times as having mild mental retardation. In an IQ test administered in 1982, Rouster was found to have an IQ of 76, although Rouster's April 1984 welfare report indicated that he was able to receive passing grades in high school.

During Phase II, Williams presented testimony that he was employed, had graduated high school, and had lived with his mother for most of his life. Further, friends and family members testified about Williams' character, claiming that he was a kind and responsible young man.

Williams' counsel gave his closing argument after the State's summation. He argued that Rouster was the triggerman and that Rouster's deprived background was reason to find that Rouster was more blameworthy than Williams. During Rouster's closing argument, his attorneys addressed Rouster's unfortunate upbringing and argued that Rouster had not intentionally killed the Reases and was not the triggerman. On February 19, 1987, the jury recommended the death sentence for both Rouster and Williams.

On March 20, 1987, a joint sentencing hearing was held, at which Rouster did not present any witnesses or testify. Williams, however, presented testimony from his family members and from his employer. The judge entered a death sentence against Rouster and issued written findings therewith./9 The judge's findings indicated that the State had proved three aggravating factors under Ind. Code Section 35-50-2-9: 1) that Rouster intentionally killed John Rease while committing the crime of robbery; 2) that Rouster intentionally killed

Henrietta Rease while committing the crime of robbery; and 3) that Rouster had previously been convicted of another murder. He also addressed each potential mitigating factor and held that none applied. Specifically, the judge found:

1.  As a juvenile the defendant was adjudicated for two burglaries in 1982 and for violation of probation in 1984. As an adult he was charged in Lake County Division I for conversion.

2.  The killings were done in a deliberate fashion. Though there is some indication that Rouster thought he was suffering an injustice, this had no basis in fact. It was pretext to give the appearance of justification for killing.

3.  From the evidence previously referred to, we conclude the victims acceded to the robbery to avoid the killings, but were completely at the defendant's mercy.

4.  Rouster planned the robbery with Williams. Both were well known to the Reases. It is reasonable to conclude that once the robbery plan was carried out the Reases could not be permitted to identify either Rouster or Williams. Rouster additionally was the one announcing that he had killed them both.

5.  Both Rouster and Williams acted as a team. It was Rouster who said: "Let's get them now." He was equal partner and not under anyone's domination.

6.  Rouster is mentally alert and was capable of making A's and B's in high school . . . . There is no indication of mental disease or defect. There was evidence that Rouster had been drinking that evening. He was, however, able to deceive the arresting officer as to his prior locations that evening and had the presence of mind to duck down in the bus when the police car went by.

7.  The defendant, Rouster is a nineteen (19) year-old male, well-informed of stature, physically strong and mentally alert. His lack of family support and traditional human relationships, though a factor in his antisocial behavior, cannot excuse that conduct as resulting from a social disorder or mental disease. The court also notes that Rouster was eighteen (18) years of age at the time of the murders. A young age is always a

mitigating factor, though not enumerated by statute. A person of tender age makes impulsive choices, often unwise, that someone of greater experience and years would not make. Had this been the first or second bad decision, his age would have been a substantial mitigating factor. But Rouster has consistently made bad decisions. He has been subjected to corrective treatment. He has been given more time to reflect. He has had his environment changed. He has had the benefit of supervision at all levels of his development. It has had no deterrent effect.

The judge then sentenced Rouster and Williams to death.

H.  Procedural History

   After the Indiana Supreme Court rejected all of Rouster's claims on direct appeal, see Rouster v. State, 600 N.E.2d 1342 (Ind. 1992), he filed a petition for post-conviction relief in Lake County Superior Court on April 28, 1995. In that petition, Rouster alleged the following: 1) that he was denied effective assistance of counsel because of his trial counsel's failure to move for severance and present expert testimony on self-defense; 2) that there were fundamental errors in the jury instructions; 3) that false evidence was submitted to the jury; 4) that the Indiana sentencing scheme was unconstitutional; and 5) that execution by electrocution was a cruel and unusual mode of punishment.

   Magistrate T. Edward Page held a hearing the week of June 26, 1995 to evaluate Rouster's claims, at which time the court received an affidavit from Dr. Jeffrey Gwynne, a reconstruction expert. Dr. Gwynne asserted that it was highly likely that Rouster was acting in self-defense at the time that Henrietta Rease was shot, based on the angle of the bullet path and the location of the bullet-hole in her dress. Additionally, he asserted that the fatal wound to John Rease also supported the theory that Rouster wasacting in self-defense. Gloria Williams, the Reases' neighbor, testified in support of Rouster and stated that the Reases had used inappropriate force in dealing with their foster children. Jimmy Gray also testified that he saw the

Reases carry guns in their home and saw a rifle in their bedroom.

Judge Richard Conroy dismissed Rouster's post-conviction petition in its entirety. Rouster appealed the denial of his petition for post-conviction relief directly to the Indiana Supreme Court, alleging the following: that his trial counsel was ineffective during the guilt phase for failing to file a motion to sever, for failing to engage in certain discovery, and for failing to present expert testimony on self-defense; that trial counsel was ineffective during Phase II for failing to present additional mitigation evidence and for failing to make a new request for separate sentencing proceedings; that errors in the Phase II jury instructions constituted fundamental error and ineffective assistance of counsel; that he was denied the right to effective assistance of counsel because of systematic defects within the Lake County Public Defender system; that the prosecutor knowingly presented false evidence against him at trial; and that his post-conviction hearing denied him due process. The Indiana Supreme Court unanimously affirmed the decision of the trial court denying post-conviction relief. See Rouster v. State, 705 N.E.2d 999 (Ind. 1999).

Rouster then filed a petition for a writ of habeas corpus in the Northern District of Indiana on February 4, 2000, alleging that his trial counsel was ineffective for failing to move for severance prior to trial and prior to Phase II, that trial counsel was ineffective for failing to present expert testimony on self-defense, that trial counsel was ineffective for failing to investigate all of the potential mitigating evidence during Phase II, and that several of the jury instructions contained fundamental errors. Rouster's habeas petition was denied, and this appeal followed. On appeal, Rouster now raises three issues: that trial counsel was ineffective for failing to move for severance prior to trial, that trial counsel was ineffective for failing to move for severance prior to Phase II, and that trial counsel was ineffective for failing to present expert testimony on self-defense.

II. Analysis

A.  Standard of Review

   Rouster filed his habeas petition on
February 4, 2000, which was after the
effective date of the Antiterrorism and
Effective Death Penalty Act of 1996
("AEDPA"), Pub. L. 104-132, 110 Stat.
1214 (1996) (codified at 28 U.S.C. sec.
2254). Therefore, the provisions of AEDPA
govern our review. See, e.g., Lindh v.
Murphey, 521 U.S. 320, 336, 117 S. Ct.
2059, 138 L. Ed. 2d 481 (1997). AEDPA
provides that if a constitutional claim
was adjudicated on the merits by the
state courts, a federal court may only
grant habeas relief based on that claim
if the state court's decision was
"contrary to" or an "unreasonable
application of" federal law as determined
by the Supreme Court of the United
States./10 28 U.S.C. sec. 2254(d).

   The Indiana Supreme Court's decision in
this case was not "contrary to" federal
law as determined by the Supreme Court of
the United States. In Williams v. Taylor,
529 U.S. 362, 405-06, 120 S. Ct. 1495,
146 L. Ed. 2d 389 (2000), the Supreme
Court stated that a state court's
decision is "contrary to" established
Supreme Court precedent when 1) the state
court applies a rule that contradicts the
governing law set forth in Supreme Court
cases or 2) the state court confronts a
set of facts that is materially
indistinguishable from those of a
decision of the Supreme Court and
nevertheless arrives at a decision
different from that reached by the
Supreme Court precedent.

   In the present case, the Indiana Supreme
Court correctly applied Strickland v.
Washington, 466 U.S. 668, 104 S. Ct.
2052, 80 L. Ed. 2d 674 (1984) as the
controlling precedent for Rouster's three
ineffective assistance of counsel
claims,/11 see Rouster, 705 N.E.2d at
1003-08, and "Strick-land undoubtedly
qualifies as 'clearly established Federal
law, as determined by the Supreme Court
of the United States,' within the meaning
of [AEDPA]." Williams, 529 U.S. at 413.
Further, Rouster concedes that the
Supreme Court has never addressed facts
that are materially indistinguishable
from those in this case. Therefore,
because the Indiana Supreme Court's
decision was not "contrary to"

established federal law, Rouster is not entitled to habeas relief on this ground.

Nevertheless, we must determine whether the Indiana Supreme Court's conclusions with respect to Rouster's three ineffective assistance of counsel claims resulted from "an unreasonable application of" Strickland. See Williams, 529 U.S. at 411. In doing so, we must keep in mind that we may not issue a writ of habeas corpus "simply because [we] conclude[ ] . . . that the relevant state-court decision applied [Strickland] erroneously or incorrectly. Rather, that application must also be unreasonable." Id.

B.  Strickland

A defendant who claims that his counsel's assistance was so defective as to warrant a reversal must establish two components: 1) that his counsel's performance fell below an objective standard of reasonableness and 2) that he was prejudiced by the deficient performance. See Strickland, 466 U.S. at 687-88. A failure to establish either prong results in a denial of the ineffective assistance of counsel claim. See Hough v. Anderson, 2001 WL 1464699, at *7 (7th Cir. Nov. 20, 2001). Prejudice occurs when there is a "reasonable probability" that but for counsel's deficient performance, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Because Rouster cannot establish that he was prejudiced by his counsel's allegedly deficient performance, we need not address whether his counsel's performance was objectively unreasonable.

C.  Severance Prior to Trial

Rouster contends that his conviction should be overturned because his trial counsel failed to move to sever his trial from that of his co-defendants. Indiana law allows for severance when "the parties' defenses are mutually antagonistic and acceptance of one party's defense precludes the acquittal of the other."/12 Lampkins v. State, 682 N.E.2d 1268, 1272 (Ind. 1997). Rouster relies on events that occurred

during closing arguments to illustrate the alleged irreconcilable defenses between his case and Williams'./13 For example, Williams' counsel depicted Rouster as an individual who wanted to settle the score and who went "berserk." In response, Rouster's counsel argued that Williams was "the real maniac" and that blood stains on Rouster's vest and shirt indicated that Rouster could not have fired the shots at the Reases. Rouster argues that this sort of "finger-pointing" establishes "mutually antagonistic defenses." Therefore, Rouster asserts he was prejudiced by being jointly tried with Williams.

In order to show that he was prejudiced by his joint trial with Williams, Rouster must show that had his counsel moved for severance and had the motion been granted so that he was tried separately, there was a "reasonable probability" that he would have been acquitted. See Strickland, 466 U.S. at 687. Even if Indiana law mandated severance in this case,/14 Rouster would not be able to establish prejudice because there was not a "reasonable probability" that he would have been acquitted if tried separately. See Strickland, 466 U.S. at 687. In applying Strickland to Rouster's claim, the Indiana Supreme Court stated:

Moreover, there is no reasonable probability that the results of the guilt phase of trial would have been different if a separation had occurred. First, each co-defendant's arguments regarding who pulled the trigger were actually of little relevance since both were convicted of felony murder under Ind. Code sec. 35-42-1-1. All participants in a robbery or attempted robbery that results in killing by one robber are deemed equally guilty of murder, regardless of which participant actually killed the victim. Additionally, the same evidence would have been admitted against Rouster even if he had been granted a separate trial. Such evidence includes testimony that Rouster said, "I killed the motherfuckers" to his co-defendant Teresa Newsome shortly after shots were heard inside the Rease home; Derrick Bryant's testimony that he heard Rouster tell Williams, "Bring them both back here" before he heard Henrietta Rease say, "Greg, why are you doing this?" followed by two shots; plus the physical evidence

of the blood consistent with that of John Rease found on Rouster's shoes, socks, and vest. Considering the amount of corroborating evidence indicating Rouster's role in the crime, Rouster was not prejudiced by his counsel's failure to move for separate trials.

Id. at 1005 (citations omitted) (emphases added).

We have no problem holding that the Indiana Supreme Court's application of Strickland was reasonable. In Hernandez, 200 F.3d at 999, we held that Strickland prejudice exists with respect to trial counsel's failure to move for severance only when "there [is] a reasonable probability that the severance would have made a difference to the outcome of the trial." In that case, Hernandez was convicted for murder based on evidence that was adduced almost entirely from his co-defendant's testimony at trial, which contradicted Hernandez's own testimony at trial. See id. We held that Hernandez was prejudiced by his trial counsel's failure to move for severance because there was a reasonable probability that had Hernandez been tried separately, his co-defendant would not have testified at Hernandez's trial. See id. at 999-1000.

In contrast to Hernandez, in the present case, the only contradictory positions proffered by the co-defendants occurred during closing arguments. As Rouster's counsel argued to the jury, however, closing arguments are not evidence. See, e.g., United States v. Henry, 2 F.3d 792, 795 (7th Cir. 1993). Therefore, had severance been granted, the evidence that would have been presented at Rouster's trial would have been the same as the evidence that was, in fact, presented at his joint trial. Cf. Hernandez, 200 F.3d at 999. This evidence would include the testimony of several witnesses who heard Rouster admit that he "killed the motherfuckers," the testimony of several witnesses that saw Rouster in or around the Rease house on the night of August 12, 1986 and then heard gunshots coming from the house, and the physical evidence indicating that Rouster had blood consistent with John Rease's blood on his clothing. Further, we agree with the Indiana Supreme Court that the contradictory defenses concerning who was the triggerman were irrelevant, as both

Rouster and Williams could have been convicted of felony murder even if the other had fired all of the gunshots. See Rogers, 315 N.E.2d at 709-10. Therefore, because we do not believe that there would have been a "reasonable probability" of a different outcome had Rouster been tried separately, we find that no prejudice resulted from Rouster's counsel's failure to file a motion for severance prior to trial. See Strickland, 466 U.S. at 687.

D.  Severance Prior to Sentencing

Next, Rouster contends that his sentence should be reversed because his trial counsel failed to move for severance prior to Phase II. Rouster's argument to the Indiana Supreme Court with respect to this issue was the same as his argument with respect to counsel's failure to move for severance prior to trial--that he and Williams had mutually antagonistic defenses. Thus, the Indiana Supreme Court was faced with the novel question of "[w]hether a defendant may claim separately that his counsel was deficient for failing to file a motion for separate trials in regard to the guilt and penalty phases of his trial." Rouster, 705 N.E.2d at 1007. The Indiana Supreme Court determined that a defendant could do so only if counsel became aware of a "previously unknown ground" that required severance after the trial had started, and still failed to move for severance. See id. There was no such ground in this case, and therefore, the Indiana Supreme Court held that because the evidence against him was overwhelming, Rouster was not prejudiced by "counsel's omission in failing to file a motion to separate trials before sentencing." Id. at 1007-08.

Now on appeal, Rouster has re-framed his argument to claim that counsel's failure to move for severance prior to Phase II constituted ineffective assistance of counsel because it denied him an individualized sentencing hearing as required by the Fourteenth Amendment. See, e.g., Woodson v. North Carolina, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). Further, even though Rouster did not mention Woodson nor its progeny in his brief to the Indiana Supreme Court, Rouster claims that the Indiana Supreme Court's decision was "contrary

to" Supreme Court precedent because it did not consider the standard elucidated in those cases. However, Woodson, 428 U.S. at 304, held that the "Eighth Amendment . . . requires consideration of the character and record of the individual offender . . . as a constitutionally indispensable part of the process of inflicting the penalty of death." That case had nothing to do with the issue at hand--whether severance during the penalty phase was required. Therefore, the standard for determining whether Rouster's counsel was ineffective for failing to move for severance prior to Phase II is "whether there is a reasonable probability that [had severance been granted] the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.

Rouster speculates that had there been separate sentencing trials, the witnesses that testified favorably about Williams (Williams' family and friends) would have testified favorably about him. Rouster also argues that the State offered evidence at the joint sentencing proceeding that Williams had previously participated in a robbery, and that the jury may have misascribed that conduct to Rouster. Next, Rouster suggests that because Williams had some mitigating evidence that Rouster did not have (evidence of a job and kindness to his relatives), Rouster looked more deserving of the death penalty in comparison. Finally, Rouster claims he was prejudiced by Williams' counsel's statements about him during closing arguments.

Despite Rouster's contentions, there is no evidence that in a separate proceeding, the jury and the judge would have balanced the aggravating and mitigating factors differently. See id. The court instructed the jury that it could recommend the death penalty for Rouster only if it found 1) that the State proved that at least one of the aggravating factors applied to Rouster and 2) that the mitigating circumstances applicable to Rouster were outweighed by the aggravating factor(s). Therefore, the jury knew that in determining whether to recommend a death sentence for Rouster, it should only consider the aggravating and mitigating factors that applied to

him. See United States v. Boykins, 9 F.3d 1278, 1289 (7th Cir. 1993) (holding that in joint trial, there is a presumption that "the jury will follow instructions on considering each defendant separately."). Also, in imposing the death sentence on Rouster, the judge made specific findings that no mitigating factor applied to Rouster. Further, Rouster's speculations about what would have happened in a separate sentencing proceeding do not render the Indiana Supreme Court's decision an unreasonable application of Strickland. See, e.g., United States v. Williams, 934 F.2d 847, 852-53 (7th Cir. 1991) (holding "speculation" insufficient to establish prejudice). For example, Rouster's argument that he looked more deserving of the death penalty than Williams because of Williams' additional mitigating evidence is belied by the fact that the jury also recommended the death sentence for Williams. Therefore, because Rouster was not prejudiced, we find that the Indiana Supreme Court's determination that Rouster's counsel was not ineffective for failing to move for severance prior to Phase II was not an unreasonable application of Strickland.

E.  Expert Testimony on Self-Defense

   Finally, Rouster argues that his trial counsel was ineffective for failing to present expert testimony on self-defense at trial. Rouster asserts that expert testimony would have established that the shots Rouster fired at John Rease were fired in self-defense, based on the trajectory of the bullet path. In response to this argument, the Indiana Supreme Court stated:

Rouster argues that trial counsel were ineffective for failing to present expert evidence to show the killings were committed in an act of self-defense. Self-defense is not available, however, as an affirmative defense when one is engaged in the commission of a robbery. Ind. Code Ann. sec. 35-41-3-2(d)(1). Rouster's proposed evidence (expert testimony meant to indicate the Reases' wounds were consistent with shots fired in self-defense) does not affect the evidence necessarily believed by the jury beyond a reasonable doubt that Rouster and Williams were both engaged in robbery at the time the killings occurred. Thus,

even if we assume Rouster was indeed acting to protect himself (an assumption that is belied by virtually all of the evidence), he is barred from asserting self-defense since the jury found he was engaged in robbery at the time of the killings. Trial counsel were not ineffective for failing to offer self-defense evidence.

Rouster, 705 N.E.2d at 1006.

Even assuming that the expert testimony would have conclusively shown that Rouster was acting in self-defense, under Indiana law, a person "is not justified in using force if he is committing . . . a crime." Ind. Code sec. 35-41-3-2(d)(1). The Indiana Supreme Court has interpreted this provision to mean that "self-defense could not be applied as a defense" to the crime of robbery. Debose v. State, 450 N.E.2d 71, 72 (Ind. 1983). In the present case, the State charged Rouster with two counts of felony murder under Ind. Code Section 35-42-1-1(2), which states that a "person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony." The jury instructions stated that in order for the jury to convict Rouster of felony murder, it must find beyond a reasonable doubt that Rouster killed the Reases while committing or attempting to commit a robbery./15 The jury returned a verdict on those two counts that stated, "[w]e, the jury, find the defendant, Gregory Anthony Rouster, guilty of Murder, a felony." Therefore, the jury necessarily found that Rouster had committed or attempted to commit robbery.

The only expert testimony that Rouster alleges his counsel was ineffective for failing to present was testimony from a "reconstruction expert [that] could have shown the .32 caliber shots fired by the Petitioner . . . were evidence of self-defense." This evidence does not affect the overwhelming evidence believed by the jury beyond a reasonable doubt that Rouster was committing or attempting to commit a robbery when the Reases were killed. This evidence includes uncontradicted testimony that Bryant heard Taylor say that Rouster had a gun, that he heard Rouster ask Taylor where the Reases kept their money, that he heard Rouster say "let's go rob them,"

that he heard Rouster enter the Rease house and threaten Henrietta Rease with a gun, and that he then heard several gunshots being fired. Further, Newsome testified that Rouster had given her money that he had taken from the Reases. Therefore, because the jury believed the overwhelming evidence that Rouster committed a robbery, because the expert testimony only concerned self-defense and did not affect the evidence concerning the robbery, and because self-defense is not an affirmative defense to robbery, Rouster was not prejudiced by his counsel's failure to present the expert testimony. See Strickland, 466 U.S. at 687. As Rouster was not prejudiced by this failure, the Indiana Supreme Court's application of Strickland was reasonable. See United States ex rel. Bell v. Pierson, 267 F.3d 544, 558 (7th Cir. 2001) (holding state court's application of Strickland reasonable where evidence that counsel failed to present would not have overcome overwhelming evidence of guilt).

Finally, Rouster argues that the Indiana Supreme Court's reliance on Indiana law stating that self-defense is not an affirmative defense to felony murder is "contrary to" and "an unreasonable application of" Washington v. Texas, 388 U.S. 14, 18-19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) and its progeny./16 See Williams, 529 U.S at 405-06. However, Rouster cannot succeed on this claim. In that case, the Supreme Court held that criminal defendants had the fundamental right to "present [their] own witness[es] to establish a defense." Washington, 388 U.S. at 19. That case dealt with a defendant's generalized right to present a defense--a "right to his day in court." Id. at 18. Rouster confuses this right with the purported right to have a state recognize any particular affirmative defense that a defendant wishes to raise. No such right exists and we reject Rouster's final claim.

III.  Conclusion

Because of the foregoing, we AFFIRM Rouster's conviction and sentence.


FOOTNOTES

/1 Ind. Code sec. 35-42-1-1(2) provides that "[a]

person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony."

/2 Taylor pleaded guilty on February 9, 1987, and therefore, did not proceed to trial.

/3 Newsome and Williams are siblings. At that time, Newsome was Rouster's girlfriend, and Toney was Williams' girlfriend.

/4 Newsome testified that John Rease was also in the living room when the Four entered the Rease house.

/5 Bryant later testified that he had given this gold watch to Mrs. Rease as a gift. Officer Lukasik also found a watch with a leather band on Williams.

/6 The other bullet recovered from Henrietta Rease's head was too damaged to test.

/7 The present version of the statute includes another mitigating factor--that "the defendant was less than eighteen (18) years of age at the time the murder was committed." Id. at sec. 35-50-2-9(c)(7) (2001).

/8 Here, the court instructed the jury that it could recommend the death penalty for Rouster only if it found: 1) that the State had proved that at least one of the aggravating factors applied to Rouster and 2) that the mitigating circumstances applicable to Rouster were outweighed by the aggravating factor(s).

/9 He also did so in a separate order with respect to Williams.

/10 AEDPA also allows habeas relief when the state court's determination of the facts was unreasonable in light of the evidence presented. 28 U.S.C. sec. 2254(d). However, Rouster has not raised such a claim so we need not consider this prong of the statute.

/11 Rouster claims that the Indiana Supreme Court did not apply the correct standard because it mentioned a case (Lockhart v. Fretwell, 506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993)) that had a more stringent requirement for showing ineffective assistance of counsel than Strickland did. See Rouster, 705 N.E.2d at 1003. In Williams, 529 U.S. 413-16, the Supreme Court said that the Virginia Supreme Court's decision, which applied the heightened Lockhart standard to hold counsel was not ineffective, was "contrary to" Supreme Court precedent because applying the correct standard--Strickland--would have rendered

counsel's performance ineffective. However, the same problem does not exist here because the Indiana Supreme Court applied the less stringent Strickland standard to hold that counsel was not ineffective, and thus, the heightened Lockhart standard did not come into play. See Rouster, 705 N.E.2d at 1004-08.

/12 Rouster claims that the Indiana Supreme Court erred in not discussing the federal standard for severance, which makes it a due process violation for joinder to occur "when the evidence or testimony offered by one defendant is truly irreconcilable with the innocence of a codefendant." Zafiro v. United States, 506 U.S. 534, 543, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (Stevens, J., concurring). However, this court has held that when dealing with a state court's application of Strickland to a situation where trial counsel failed to move for severance in state court, the Zafiro standard is not "relevant." Hernandez v. Cowan, 200 F.3d 995, 999 (7th Cir. 2000).

/13 Rouster also mentioned in his brief that Newsome's counsel argued during closing arguments that Newsome had received the money the police found on her "from Greg, after he had told her these people were dead." However, Rouster has not identified how this comment was irreconcilable with his defense.

/14 With respect to this point, the Indiana Supreme Court opined that severance may not have been warranted under Indiana law because even if the jury believed Williams' counsel's argument that Rouster was the triggerman, it still could have acquitted Rouster based on his intoxication defense. Therefore, Rouster and Williams' defenses may not have reached the level of antagonism necessary to warrant severance. See Rouster, 705 N.E.2d at 1005.
/15 Indiana law states that a "person who knowingly or intentionally takes property from another person . . . by using or threatening the use of force on any person . . . commits robbery." Ind. Code sec. 35-42-5-1.

/16 Rouster makes this argument even though he did not mention Washington in his brief to the Indiana Supreme Court.