In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 01-4225

DARNELL WILLIAMS,

*Petitioner-Appellant,*

v.

CECIL DAVIS, SUPERINTENDENT, INDIANA STATE PRISON,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 99 C 570—**Allen Sharp**, *Judge.*

---

ARGUED JULY 23, 2002—DECIDED AUGUST 29, 2002

---

Before COFFEY, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* A jury convicted Petitioner Darnell Williams of two counts of felony murder in Indiana state court, and the trial judge sentenced him to death. After exhausting his state remedies, Williams filed a petition for writ of habeas corpus in the Northern District of Indiana, which the district court denied. Williams now appeals, claiming ineffective assistance of trial counsel. For the following reasons, we affirm.

**I. History**

John and Henrietta Rease, an elderly couple who lived in Gary, Indiana, cared for, fed, and housed foster children at their home in exchange for $160 per month per child. One such foster child was Gregory Rouster, who lived with the Reases from November 1985 until his eighteenth birthday on February 7, 1986. Four months later, the Reases were robbed and shot to death in their home. Police immediately arrested Rouster and his three friends, Darnell Williams, Theresa Newsome, and Edwin Taylor (another foster child living with the Reases), and charged them each with two counts of felony murder. *See* IND. CODE § 35-42-1-1(2).[1] Further, the State sought the death penalty against Williams and Rouster pursuant to Indiana's death penalty statute, IND. CODE § 35-50-2-9.

*A. Trial*

At Williams' joint trial with Rouster and Newsome,[2] the following evidence was adduced: On the night of August 12, 1986, Williams, Rouster, Newsome, and Kim Toney went to the Reases' house to collect money that Rouster believed the Reases owed to him. Derrick Bryant, a seventeen-year-old foster child who lived with the Reases at the time that the crimes were committed, testified that when Williams and Rouster got to the house, they went into a back room with Henrietta Rease and got into an argument with her about whether the Reases owed Rouster money. After Henrietta Rease asked Rouster to leave the house, Bryant heard Williams say, "I won't let her, she's doing nothing but

---

[1]  That section of the Indiana Code provides that "[a] person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony." *Id.*

[2]  Taylor pleaded guilty and did not proceed to trial.

gypping [Rouster] out of the money." Bryant then heard a series of gunshots and went upstairs into the attic to hide. While in the attic, Bryant heard a conversation take place between Williams, Rouster, and Taylor, whereby Williams and Rouster agreed to rob the Reases at gunpoint. Bryant then ran downstairs to hide behind a stairway and heard Williams and Rouster bring the Reases into the bedroom, at which point Henrietta Rease told Williams not to hit John Rease. Next, Bryant heard Williams state, "it's your time" and heard Rouster reply, "waste them." Bryant then heard a second series of gunshots coming from the bedroom, at which point he ran out of the house and flagged down a police car.

Several neighborhood teenagers, such as Eugene Powell, Jamal Pope, Jimmy Gray, and Demond Ligon, testified about the events that they witnessed that night and corroborated Bryant's testimony regarding two series of gunshots coming from the Reases' house shortly after Williams and Rouster entered the house. Moreover, the teenagers testified about a third series of gunshots that came from the Reases' house when Rouster and Newsome were in the Reases' front yard, but while Williams presumably was still inside of the house.[3] The teenagers' testimony was corroborated by Lelia Gray, Jimmy Gray's mother, who explained that she saw Williams and Rouster enter the Reases' house, heard two series of gunshots, and

---

[3] No one testified that Williams was still in the house when this third series of gunshots was fired. However, the only time that Williams was seen leaving the house was after the first series of gunshots, when Williams searched for something in the front yard and exclaimed, "my shells." Powell and Pope then saw Williams re-enter the house, and they then heard the second series of gunshots. No one saw Williams leave the house before the third series of gunshots.

also heard a third series of gunshots coming from the Reases' house while Rouster and Newsome were outside.

Lake County crime technician Ronald Lach searched the Reases' house for evidence later that night and discovered the Reases' bodies lying on the bedroom floor. Lach also found several live .30 caliber cartridges in the Reases' bedroom as well as several fired .22 caliber and .32 caliber shells. Finally, he found a .22 caliber pistol in the bedroom and a .32 caliber pistol in the Reases' backyard that were later determined to have fired the gunshots that killed the Reases.

Lake County Police Officer Timothy Lukasik arrested Williams that same night. At that time, Williams had a black leather pouch with him that contained, among other things, $232.00 in cash, a wallet with no money in it, and a .30 caliber live round of ammunition.[4] Williams was then taken to the Gary Police Department, where crime technician Lach testified that he "observed" Williams' clothing but did not find any blood on it. Williams was detained at the Gary City Jail for two days, after which he was transferred to the Lake County Jail. On August 15, 1986, Williams' clothing was confiscated at the Lake County Jail and stored in an evidence lab, and he was issued a jail uniform. Lake County Police Officer Bill Wegman testified that approximately one week later, he gathered Williams' clothing from the evidence lab, placed it in a plastic bag, and brought it to the Prosecutor's Office.[5]

---

[4] Williams' mother later testified that Williams had possessed all of these items before August 12, 1986.

[5] Rouster was arrested on the night of the murders by Indiana State Trooper Rodney Means, who testified that when he arrested Rouster, he noticed several red spots that looked like blood stains on the back of Rouster's white shirt. Lach also testified that he

(continued...)

Eventually, Williams' clothing was given to Kimberly Epperson, a forensic serologist employed by the Indiana State Police. Epperson testified that she examined the shorts that Williams wore on the night of the murders and that they had three small spots of dried human blood on them. She explained that the blood she found on Williams' shorts was consistent with the blood type of John and Henrietta Reese and of Rouster, but not consistent with Williams' blood type nor that of Newsome or Taylor.[6] She further explained that the blood found on Williams' shorts was consistent with the blood type of 45% of the population. On cross-examination by Williams' counsel, Epperson admitted that she did not find any blood on Williams' shoes.

During closing arguments, the State argued to the jury that in addition to the witnesses' testimony, the blood found on Williams' shorts also established that Williams participated in the Reases' murders. During his closing argument, Williams' counsel attacked the weight of the blood evidence, stating that the State did not present a "splatter" expert to testify about how the blood got on Williams' shorts. Williams' counsel also argued that the State's evidence concerning the blood found on Williams' shorts showed that the blood could have come from "millions of people" other than the Reases. Thus, Williams' counsel attempted to show that the blood found on Williams' shorts may have come from somewhere other than the crime scene and thus did not establish Williams' participation in the crimes.

---

[5] (...continued)
observed blood stains on Rouster's clothing at the Gary Police Department and therefore collected Rouster's clothing as evidence at that time and submitted it to the Indiana State Police Post laboratory for testing.

[6] Epperson also testified that the blood found on Rouster's clothes was consistent with the blood type of John and Henrietta Rease, but not with that of Newsome, Taylor, Rouster, nor Williams.

## *B. Sentencing*

The jury found Williams and Rouster guilty of two counts of felony murder and acquitted Newsome on both counts. At the joint penalty phase, the State sought the death penalty against both defendants pursuant to IND. CODE § 35-50-2-9. That statute provided that the State could seek the death penalty against a defendant convicted of murder if the State proved beyond a reasonable doubt one of the following aggravating factors: that the "defendant committed murder by intentionally killing the victim while committing or attempting to commit" robbery or that the "defendant has been convicted of another murder." *Id.* §§ 35-50-2-9(b)(1)(G) & (b)(7). For the penalty phase of this case, the State alleged that at least one of the aggravating factors was present: 1) Williams intentionally killed John Rease while committing or attempting to commit a robbery, 2) Williams intentionally killed Henrietta Rease while committing or attempting to commit a robbery, or 3) Williams had been convicted of the murders of both John and Henrietta Rease.

The Indiana death penalty statute also provided that Williams could present evidence pertaining to any potential mitigating circumstances. *See id.* § 35-50-2-9(c). The statute further provided that the jury could recommend the death penalty, *see id.* § 35-50-2-9(e), only after it had found that the state had proved beyond a reasonable doubt that at least one of the aggravating circumstances existed and that any mitigating circumstances that existed were outweighed by the aggravating circumstance(s). *See id.* § 35-50-2-9(k). The court instructed the jury accordingly. The trial judge then had the responsibility of making the final sentencing determination after considering the jury's recommendation and the standards described in § 35-50-2-9(k). *See id.* § 35-50-2-9(e).

During the sentencing hearing, Taylor testified about the following events that took place at the Reases' house on

August 12, 1986: Henrietta Rease asked Williams and Rouster to leave after they accused her of keeping money purportedly owed to Rouster. Williams then pointed a gun at Taylor and asked him where the Reases kept their money. Taylor answered that the Reases kept their money on the bedroom dresser, to which Williams replied, "you better not be lying." Taylor then ran to his friend's house to call the police and heard several gunshots coming from the Reases' house. Taylor also testified that Williams was the last person he saw with a gun.

The State also introduced evidence that Williams had previously participated in a robbery similar to the one committed against the Reases. Williams presented testimony that he was employed, had graduated high school, and had lived with his mother for most of his life. Further, friends and family members testified about Williams' character, claiming that he was a kind and responsible young man.

The jury ultimately recommended the death penalty for both Williams and Rouster. Thereafter, the trial judge indicated that the State had proved three aggravating factors under IND. CODE § 35-50-2-9(b): 1) Williams intentionally killed John Rease while committing the crime of robbery; 2) Williams intentionally killed Henrietta Rease while committing the crime of robbery; and 3) Williams had been convicted of multiple murders—that of both John and Henrietta Rease. He also addressed the potential mitigating circumstances and held that none applied. The judge then sentenced both Williams and Rouster to death.

## C. *Procedural History*

After the Indiana Supreme Court rejected Williams' claims on direct appeal, he filed a petition for post-conviction relief, alleging, *inter alia*, that his two trial attorneys

were ineffective for failing to fully review discovery materials given to them by the State. Counsel's entire defense at trial was based on their belief that no blood was found on Williams' clothing. However, serologist Epperson's report was given to Williams' attorneys before trial, and that report indicated that Epperson had, in fact, tested blood that she had found on Williams' shorts. At the post-conviction hearing, trial counsel admitted that they had received and read Epperson's pre-trial report, but testified that they had simply overlooked the fact that Epperson had indicated that she had found blood on Williams' shorts. Trial counsel claimed that they did not know that Epperson had found blood on Williams' shorts until Epperson was called to testify towards the end of the trial. As a result, the trial record contained few facts concerning the police officer's examination of Williams' clothing on the night of his arrest and concerning Epperson's testing of Williams' clothing. Therefore, at the post-conviction hearing, many more facts concerning Williams' clothing were adduced.

For example, crime technician Lach testified that he examined Williams' clothing at the Gary Police Department on the night that Williams was arrested and that he did not find any blood on his shorts at that time. Lach's examination of Williams' clothing consisted of having Williams stand about two feet away from him, raise his arms in the air, and turn around slowly. Lach also told Williams to lift his feet up so that Lach could observe the bottom of Williams' shoes. Further, Lach testified that at least two other police officers were present during this examination and that they also did not see any blood on Williams' shorts. Finally, Lach explained that due to the color and pattern of the shorts Williams wore that night, it would have been difficult to see whether there was any blood on them at that time.

In addition, Epperson testified at the post-conviction hearing that Indiana State Police Laboratory policy re-

quired clothing to be stored individually and in sealed paper bags so that testable biological material would not degrade and so that the serologists would be able to perform additional tests in order to narrow down the source of the blood. She testified that the manner in which Williams' clothing was sent to the lab violated this policy because all of Williams' clothing items arrived in a single plastic bag. However, Epperson testified that despite the improper storage in this case, she was able to obtain results from the tests she conducted on Williams' shorts.

In support of his petition for post-conviction relief, Williams asserted that had his trial attorneys adequately reviewed Epperson's report before trial, they would have known about the blood found on Williams' shorts and their defense strategy at trial would have been more effective. Based on their misconception that no blood had been found on Williams' clothing, trial counsel believed that there was little evidence placing Williams in the Reases' bedroom on the night of the murders. Further, before the post-conviction court, Williams contended that because trial counsel were so surprised by the fact that blood had been found on Williams' shorts, they were unable to attack the weight of the blood evidence in an effective manner. Specifically, Williams asserted that he was prejudiced because competent counsel would have been able to weaken the inference that the blood found on Williams' clothing meant that he was in the Reases' bedroom when the murders took place. According to Williams, competent trial counsel could have persuaded the judge and jury that the blood found on Williams' shorts did not come from the crime scene. Therefore, Williams asserted that his trial counsel were unconstitutionally ineffective for their inactions.

The post-conviction court denied Williams' claim, and the Indiana Supreme Court affirmed, stating as follows:

> Even if Williams' counsel had more thoroughly investigated the blood evidence, as his counsel was able to do

for post-conviction, they would have been unable to provide the jury with any information significantly different from that actually provided by the State's witness. Because the evidence Williams argues should have been presented would not have significantly changed the facts available to the judge and jurors, Williams was not prejudiced during either the guilt or sentencing phase of his trial.

*Williams v. State*, 706 N.E.2d 149, 156 (Ind. 1999). In his petition for writ of habeas corpus, Williams raised, *inter alia*, the same ineffective assistance of counsel claim. The district court denied the petition, agreeing with the Indiana Supreme Court that Williams was not prejudiced by trial counsel's performance. Williams appeals the denial of his habeas petition, arguing that trial counsel's deficient performance prejudiced him during the sentencing phase of his trial.[7]

## II. Analysis

### A. Standard of Review

Williams filed his habeas petition on May 12, 2000, which was after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (1996) (codified at 28 U.S.C. § 2254). Therefore, the provisions of AEDPA govern our review. *See, e.g., Lindh v. Murphey*, 521 U.S. 320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). AEDPA provides that if a constitutional claim was adjudicated on the merits by the state courts, a federal court may only grant habeas relief based on that claim if the state court's decision was "contrary to"

---

[7] We agree with Williams' appellate counsel's concession at oral argument that trial counsel's performance did not prejudice Williams during the guilt phase of his trial.

or an "unreasonable application of" federal law as determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(1), or if the state court's determination of the facts was unreasonable in light of the evidence presented. *See id.* at § 2254(d)(2).

Williams argues that the Indiana Supreme Court's determination that he was not prejudiced by his trial counsel's performance was an "unreasonable application of" *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 674. *See* 28 U.S.C. § 2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362, 411, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). In addressing Williams' claim, we must keep in mind that we do not issue a writ of habeas corpus "simply because [we] conclude[ ] . . . that the relevant state-court decision applied [*Strickland*] erroneously or incorrectly. Rather, that application must also be unreasonable."[8] *Taylor*, 529 U.S. at 411.

---

[8] Williams also argues that the Indiana Supreme Court's statement that "the evidence Williams argues should have been presented [at trial] would not have significantly changed the facts available to the judge and jurors" was an unreasonable determination of the facts. *See id.* at § 2254(d)(2). However, Williams has not identified a set of facts that competent counsel could have adduced that was significantly different from the facts presented at trial, as discussed below, and therefore, we reject this claim.

Further, Williams claims that the Indiana Supreme Court's decision was "contrary to" federal law, *see id.* at § 2254(d)(1), because it applied a stricter ineffective assistance of counsel standard than the correct *Strickland* standard. However, we have addressed and rejected this identical claim brought by Williams' co-defendant, *see Rastafari v. Anderson*, 278 F.3d 673, 687 n.11 (7th Cir. 2002), and here, too, hold that the Indiana Supreme court applied *Strickland*, the correct legal standard. *See Williams*, 706 N.E.2d at 154-56. Therefore, the Indiana Supreme Court's decision was not "contrary to" federal law. *See Taylor*, 529 U.S. at 405-06.

## *B. Ineffective Assistance of Counsel*

In order to prevail on his ineffective assistance of counsel claim, Williams must establish that trial counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by the deficient performance. *See Strickland*, 466 U.S. at 687-88. A failure to establish either prong results in a denial of the ineffective assistance of counsel claim. *See Rastafari*, 278 F.3d at 688. Prejudice occurs when there is a "reasonable probability" that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* Further, "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

Before trial in this case, trial counsel were furnished with a serologist report indicating that blood had been found on Williams' shorts. However, trial counsel did not become aware of that fact until the middle of trial, a fact that undermined their entire defense strategy. Their strategy, as indicated earlier, was based on the assumption that no blood was found on Williams' clothing. Consequently, at trial, trial counsel did not cross-examine Epperson about the blood on Williams' shorts, did not cross-examine Lach about the fact that he did not see any blood on Williams' shorts on the night that Williams was arrested, and did not present expert testimony about how the blood may have gotten onto Williams' shorts. We agree with both parties that trial counsel's performance in this aspect of the case was deficient.

Williams contends that the blood on his shorts was the key piece of evidence that lead to the imposition of the death penalty. He argues that competent counsel would

have challenged the weight of the blood evidence by presenting "evidence to show that the blood Epperson described did not necessarily come from the crime scene."[9] Nevertheless, the Indiana Supreme Court found that Williams was not prejudiced because the evidence that Williams argues should have been presented at trial was not substantially different than the evidence that was actually presented at trial and therefore would not have significantly changed the facts that were available to the judge and jury. *See Williams*, 706 N.E.2d at 156.

We hold that the Indiana Supreme Court's decision was not an unreasonable application of *Strickland* for two reasons. First, the trial judge and jury were well-informed of the fact that the blood found on Williams' shorts could have come from somewhere other than the crime scene. For example, Epperson testified that the blood was consistent with the blood of 45% of the population, and thus her testimony showed that there were millions of potential sources of the blood other than the Reases or Williams. Indeed, Williams' counsel seized on this point during closing arguments to note that the blood found on Williams' shorts could have come from "millions of people." Further, Williams' counsel also stated during closing arguments that the State did not present a "splatter" expert, and therefore, the State failed to show that the blood came from the crime scene. Finally, Lach conceded at trial that he observed Williams' clothing on the night that he was arrested, but did not see any blood on it, thus creating a potential inference that the blood got onto Williams' shorts sometime

---

[9] Williams also claims that his trial counsel failed to attack the admissibility of the shorts. However, at trial, Williams' counsel did object to the admission of the shorts—an objection the trial court overruled. Thus, his claim on appeal that he was prejudiced by trial counsel's failure to move to suppress Williams' shorts is without merit.

after Lach observed them but before his clothing was confiscated three days later. Therefore, we agree with the Indiana Supreme Court that the facts about which Williams argues competent counsel would have presented at trial were in fact known by the jury when it recommended the death penalty—and by the trial judge when he sentenced Williams to death.

More importantly, however, Williams was not prejudiced because even without the blood evidence, he still would have been sentenced to death. Bryant testified that Williams and Rouster agreed to rob the Reases at gunpoint, that Williams encouraged Rouster by telling him not to let the Reases "gyp" him out of the money, and that Williams also threatened the Reases physically. Bryant also heard Williams say "it's your time" followed by Rouster saying "waste them," and then heard several gunshots. Further, Taylor testified during the sentencing hearing that Williams threatened the Reases, pointed a gun at Taylor and asked him where the Reases kept their money, and was the last person he saw with a gun. In addition, the police found .30 caliber cartridges on Williams and in the Reases' bedroom on the night of the murders as well as $232.00 in cash in Williams' pouch. Finally, the neighborhood teenagers testified that they heard a third series of gunshots when Williams was still inside of the Reases' house, but while Rouster was in the Reases' front yard talking to Newsome. The fact that witnesses heard gunshots coming from inside of the house when Rouster and Newsome were outside is strong circumstantial evidence that Williams fired a gun that night.

The cumulative effect of the above-described evidence is that Williams planned the robbery with Rouster, actively participated in the robbery and the murders, and that either Williams or Rouster (or both) fired the gunshots that killed the Reases. Thus, the evidence—excluding the blood evidence—was sufficient to support the presence of the

three aggravating circumstances found by the trial judge. *See* IND. CODE §§ 35-50-2-9(b)(1)(G) & (b)(7); *see also Saylor v. State*, 765 N.E.2d 535, 556 (Ind. 2002) (stating that "major participation in the killing" plus the requisite mental state are needed to establish § 35-50-2-9(b)(1)(G)—the aggravating factor of intentionally killing while committing a robbery).

Likewise, this evidence was sufficient to show that the aggravating factors outweighed the mitigating factors. The only mitigating factor that Williams addresses on appeal is his contention that he was a minor accomplice. *See* IND. CODE § 30-50-2-9(c)(4). However, the evidence shows that he planned the robbery with Rouster and was a major participant in the robbery and murders and thus supports the trial judge's finding that this factor did not apply to Williams' case. *See, e.g., Wisehart v. State*, 693 N.E.2d 23, 37 (Ind. 1998) (finding § 30-50-2-9(c)(4) inapplicable even though defendant did not strike the fatal blow). Therefore, the Indiana Supreme Court's conclusion that Williams was not prejudiced by trial counsel's deficient performance was not an unreasonable application of *Strickland*.

Williams' other claims on appeal are without merit and warrant no discussion.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Williams' petition for writ of habeas corpus.

A true Copy:

      Teste:

_____

           *Clerk of the United States Court of Appeals for the Seventh Circuit*