# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 02-1945

AKEEM AKI-KHUAM,
f/k/a EDWARD EARL WILLIAMS,

*Petitioner-Appellee,*

v.

CECIL DAVIS, Superintendent,

*Respondent-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 00 C 386—**Allen Sharp**, *Judge.*

————————

ARGUED DECEMBER 17, 2002—DECIDED AUGUST 5, 2003[*]

————————

Before BAUER, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* After the Supreme Court of Indiana affirmed the murder conviction and death sentence of Petitioner-Appellee, Akeem Aki-Khuam,[1] the United States District Court for the Northern District of Indiana granted

——————————————

[*] This Court issued an opinion in this case on May 8, 2003. That opinion has been vacated and the present opinion is issued in its place.

[1] We refer to Petitioner by his legal name, Akeem Aki-Khuam, noting that the district and state court opinions use his former name, Edward Earl Williams.

his petition for writ of habeas corpus, finding that the state trial court violated his constitutional equal protection and due process rights during jury selection. The district court vacated Petitioner's conviction and sentence and ordered him released unless retried. On behalf of Respondent-Appellant, Superintendent Cecil Davis, the State of Indiana appeals the district court's order granting habeas relief. For the reasons set forth below, we affirm the decision of the district court.

## BACKGROUND

We presume the facts underlying Petitioner's conviction are stated correctly in the record of the state court proceedings. The Indiana Supreme Court recited those facts as follows:

> In the early morning hours of June 19, 1992, [Petitioner], armed with a handgun, Jemelle Joshua, armed with a shotgun, and three others set out to steal audio and video equipment from the basement of school teacher Michael Richardson. [Petitioner] and Joshua were admitted to Richardson's home and their three accomplices followed them in. Besides Richardson, they encountered a number of children and adults, including Richardson's sister, Debra Rice, and Robert Hollins. While [Petitioner] held his gun to Richardson's head and Joshua held Rice, their accomplices headed for the basement. Hollins intercepted them and began to wrestle with one of them in the kitchen. [Petitioner] responded by shooting Hollins in the back.

> The electronic equipment proved too difficult to remove and [Petitioner] ordered the occupants of the house to lie down. Rice attempted to escape and Joshua shot her in the chest. As the invaders left the home, [Peti-

tioner] shot each of Hollins, Rice and Richardson once in the head despite Richardson's plea, "Please don't kill me." A few hours later, [Petitioner] would tell his sister that he shot the victims so there wouldn't be any witnesses.

*Williams v. State*, 669 N.E.2d 1372, 1375-76 (Ind. 1996).

Petitioner, who is African-American, was charged with three counts of murder and felony murder in Lake County, Indiana. IND. CODE §§ 35-42-1-1(1) & (2). The prosecution further alleged two aggravating factors for which it sought the death penalty: (i) intentional killing during the course of a robbery, IND. CODE §§ 35-50-2-9(b)(1)(F); and (ii) commission of multiple murders, IND. CODE §§ 35-50-2-9(b)(8).

During a pretrial hearing on January 12, 1993, Judge James Letsinger outlined procedures for jury selection, including peremptory challenges, intended to ensure compliance with the due process and equal protection requirements of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. The following exchange took place between Judge Letsinger and trial counsel for Petitioner:

Trial Court: From the first peremptory strike, each side is going to have to have some reason for striking that person. I mean there's almost no, no person on a jury that isn't protected now. I mean they've extended it to everything.

Defense Counsel: So what I'm hearing from the court is the peremptory challenges have now all been converted to challenges for cause?

Trial Court: Almost. Almost. In the words of *Splunge*,[2] you've got to have some plausible reason supported by the record, supported by the record, plausible reason

---

[2]  *Splunge v. Clark*, 960 F.2d 705 (7th Cir. 1992).

that is nonracial, non-gender, nonreligious, non-body language. They won't even let—they won't even allow body language. *Splunge* struck a black juror because she said—she didn't understand the burden of proof in a criminal case, when actually her answers were the same as everybody else's answers. It had to be supported by the record.

During voir dire on January 25, 1993, the trial court sua sponte instructed counsel for each party to present its peremptory challenges along with a "neutral reason" for each. The trial court excused two individuals after accepting the prosecution's stated reasons for challenging them, and another two after accepting Petitioner's stated reasons for challenging. However, the trial court rejected Petitioner's stated reasons for five of his seven total challenges, even though the prosecution raised no objection to Petitioner's challenges. With respect to four of those five, Petitioner argued on direct appeal to the Indiana Supreme Court that the trial court improperly rejected his reasons for peremptorily challenging them. In its opinion affirming Petitioner's conviction and death sentence, Indiana Supreme Court synopsized the trial court's rejection of those four challenges as follows:

1. The defense indicated that it sought to strike prospective juror Sosnawski, a white male, because in defense counsel's "discussions with him, [defense counsel] didn't get the impression that he really understood what was going on." Finding "impressions" to be a "terrible" reason and a "euphemism" (presumably for a racially motivated strike), the trial court found the explanation "not race neutral" and refused to excuse Sosnawski.

2. The defense indicated that it sought to strike prospective juror Wilson, a white male, because defense counsel's "general impression" was, "number one, that

he was not being honest; two, that his responses . . . left [defense counsel] with the impression that this gentleman was maybe not being entirely honest with" [the trial court]. Because counsel was not "able to point to a question and answer in the record that gives [ ] a good reason for striking [Wilson] from the jury," the trial court refused to excuse Wilson.

3. The defense indicated that it sought to strike prospective juror Bobalik, a white female, because she failed to understand the presumption of innocence. During voir dire, defense counsel had asked all the members of the panel who believed that the defendant was not guilty at that point to raise their hands. Bobalik was apparently the only juror who did not raise his or her hand. The trial court rejected this reason, commenting that counsel has asked "a trick question," the kind "that gets students flunked out of law school." Because counsel did "not have a record showing that Bobalik [could] not give the defendant the presumption of innocence," the trial court refused to excuse Bobalik.

4. The defense indicated that it sought to strike prospective juror Brandys, a white female, because she didn't "understand [ ] that the defendant has the absolute right not to testify" and that "[s]he clearly indicated . . . in two points, one that she wanted the defendant to testify; two, that she thinks defense attorneys are slicksters." The state argued that Brandys did properly understand the presumption of innocence. Concluding that most people want the defendant to testify and don't understand that they have a constitutional right not to unless it is explained to them and that defense counsel had introduced the word "slickster," not Brandys, the trial court refused to excuse Brandys.

*Williams*, 669 N.E.2d at 1380-81.

At the trial's conclusion, the jury found Petitioner guilty on all counts; but, deadlocked as to his punishment, it was unable to return a sentencing verdict. Instead, the trial court sentenced Petitioner to death on March 2, 1993. On direct appeal of the conviction and sentence before the Indiana Supreme Court, Petitioner challenged, *inter alia*, the trial court's denial of his peremptory challenges. After the Indiana Supreme Court affirmed his conviction and sentence, *Williams*, 669 N.E.2d at 1372, it denied Petitioner's request for rehearing, and the United States Supreme Court denied his petition for writ of certiorari. *Williams v. Indiana*, 520 U.S. 1232 (1997). Petitioner subsequently filed, and the Lake County Superior Court denied, a petition for post-conviction relief raising various issues not directly relevant to our disposition of this matter. The Indiana Supreme Court affirmed the denial of post-conviction relief in *Williams v. State*, 724 N.E.2d 1070 (Ind. 2000), and declined to rehear the matter, and once more the United States Supreme Court denied Petitioner's petition for writ of certiorari in *Williams v. Indiana*, 531 U.S. 1128 (2001).

In December 2001, Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Northern District of Indiana seeking federal collateral review of his conviction and death sentence. Petitioner claimed violations of his constitutional rights as a result of (i) the trial court's denial of his peremptory challenges and the Indiana Supreme Court's failure to apply *Purkett v. Elem*, 514 U.S. 765 (1995), in reviewing that denial; (ii) the ineffective assistance of his trial counsel; (iii) prosecutorial misconduct at trial; (iv) the trial court's use of a psychological questionnaire at sentencing; and (v) the trial court's limitation of funds available to Petitioner to develop mitigation evidence. In a Memorandum and Order filed on March 25, 2002, the district court granted the petition for writ of ha-

beas corpus with respect to Petitioner's peremptory chal-
lenge claim and denied relief with respect to all remaining
claims. *Aki-Khuam v. Davis*, 203 F. Supp. 2d 1001 (N.D.
Ind. 2002). Specifically, the district court "determined that
the manner in which the state court trial judge attempted
to deal with the subject of peremptory challenges is at odds
with the constitutional teaching of *Batson* and its progeny
in the Supreme Court of the United States." *Id.* at 1020.[3]
This appeal ensued.

## ANALYSIS

We review the district court's legal determinations de
novo and—because Petitioner filed his habeas petition sub-
sequent to the effective date of the Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA"), codified at
28 U.S.C. § 2254—in accordance with the provisions of 28
U.S.C. § 2254(d). *See, e.g.*, *Williams v. Davis*, 301 F.3d 625,
631 (7th Cir. 2002). That section provides, in relevant part,
as follows:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim
> that was adjudicated on the merits in State court pro-
> ceedings unless the adjudication of the claim . . .
> resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Fed-

---

[3] The district court further noted that it "can and does in this
proceeding take into account the decision of the Supreme Court of
the United Sates in *Purkett* [*v. Elem*, 514 U.S. 765 (1995)], decided
after the trial of this case, but before the appeal was decided by
the Supreme Court of Indiana, witnessed by the reference to the
case in the footnote at 669 N.E.2d at 1380, n. 6." *Aki-Khuam*, 203
F. Supp. 2d at 1020.

eral law, as determined by the Supreme Court of the United States.

Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1) (2002). Implicit in the district court's finding that the trial court's jury selection process was "at odds" with federal law as articulated in *Batson* and subsequent cases is that Petitioner's resulting conviction was both contrary to and an unreasonable application of that law.

In order to prevent the violation of defendants' and jurors' equal protection rights resulting from prosecutors' use of peremptory challenges to strike jurors of the same race as a given defendant, the United States Supreme Court formulated a prophylactic test to safeguard criminal defendants against seemingly discriminatory peremptory challenges. *Batson*, 476 U.S. at 86-87, 96-98. To raise a successful objection to a prosecutor's racially discriminatory peremptory challenge, a defendant must first make a prima facie showing of racial discrimination demonstrating the following: (i) the defendant is a member of a recognized minority group, (ii) the prosecution has peremptorily challenged a prospective juror belonging to the same minority group, and (iii) any other facts supporting an inference that race is the sole basis for that challenge. *Id.* at 96. Once this prima facie case is made, the burden then shifts to the prosecution to articulate a "clear and reasonably specific" explanation of its legitimate, racially neutral reasons for exercising the challenge. *Id.* at 98, n.20 (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)). "The trial court will then have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98. In subsequent decisions, the Supreme Court extended application of the *Batson* analysis to situations where (i) the prosecution peremptorily challenges a minority venireman in the trial of a white defendant, *Powers v. Ohio*, 499 U.S. 400 (1991); (ii) any party to a civil action challenges a potential

juror based on his or her race, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991); and (iii) a criminal defendant challenges a potential juror on the basis of race, *Georgia v. McCollum*, 505 U.S. 42 (1992). These elaborations upon *Batson* were founded, in part, upon the Court's recognition of several principles: (i) jury selection implicates the equal protection rights of jurors as well as defendants; (ii) in making a peremptory challenge, a defendant assumes the role of state actor for Equal Protection Clause purposes, insofar as jury selection by its nature "fulfills a unique and constitutionally compelled government function"; (iii) the state has standing to enforce the equal protection rights of potential jurors (enabling the prosecution to raise a *Batson* objection to defendant's peremptory challenge); and (iv) a criminal defendant's rights to effective assistance of counsel and an impartial jury do not eliminate a would-be juror's right to equal protection. *See, e.g., McCollum*, 505 U.S. at 48-49, 52, 56, 57-58.

Thus refined, the *Batson* analysis entails the following three steps: (1) the party opposing a peremptory challenge must make a prima facie showing of racial discrimination; (2) the party exercising the peremptory challenge must provide a race-neutral explanation therefor; and (3) the trial court must determine whether the parties have satisfied their respective burdens of proving or rebutting purposeful racial discrimination. See, e.g., Hernandez v. New York, 500 U.S. 352, 358-59 (1991). More recently, the Supreme Court commented that "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible. 'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem*, 514 U.S 765,767-68 (1995) (per curium) (quoting *Hernandez*, 500 U.S. at 360, 374

(plurality opinion) (O'CONNOR, J., concurring in judgment)).[4] As the *Purkett* Court further explained,

> [i]t is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden . . . . [T]o say that a trial judge may choose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge must terminate the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Purkett*, 514 U.S. at 768 (emphasis in original).

Petitioner adduces various errors in the trial court's administration of the *Batson* test and the Indiana Supreme Court's direct review thereof, two of which especially troubled the district court.

First, at no time did the prosecution raise a *Batson* challenge to Petitioner's peremptory strikes, much less establish a prima facie showing of purposeful discrimination. Rather, the trial judge replaced the first step of the *Batson* analysis with the court's presumption of purposeful discrimination, thereby saddling Petitioner with the burden of overcoming that presumption. As the district court observed, the voir dire "process is still an adversarial one and the case law, including *Batson* and the cases that followed it, make it clear that *Batson* issues must be raised. *Batson* is not self-executing." *Aki-Khuam*, 203 F. Supp. 2d

---

[4] While *Purkett* involved a defendant's opposition to the prosecutor's peremptory challenge, *McCullom* instructs that *Purkett*'s reference to the "prosecutor's" explanation applies equally to *any* party offering an explanation to rebut a prima facie showing of a racially motivated strike per step two. *McCullom*, 505 U.S. at 59.

at 1019. The district court further noted that "[n]one of the cases between *Batson* and *Purkett* suggest[s] that the prima facie case was not required, and *Hernandez*, which was relied upon by the trial court and the Indiana Supreme Court, explicitly set out the test, including the prima facie case requirement." *Id.* at 1018. A presumption of discriminatory intent during voir dire is thus contrary to federal law as established in *Batson* and subsequent related cases.

Second, as recounted above in the excerpted portion of the Indiana Supreme Court's opinion, the trial court rejected Petitioner's race-neutral explanations not because they demonstrated a discriminatory motive, but rather because the trial court found the reasons, "terrible," unsupported in the record, based on a prospective juror's response to a "trick question," or due to defense counsel's introduction of the word "slickster." Insofar as the trial court rejected Petitioner's reasons outright as unreasonable or implausible (and not because they evinced some inherent discriminatory intent) it applied precisely the standard that *Purkett* rejects. 514 U.S. at 767-68 ("The second step . . . does not demand an explanation that is persuasive, or even plausible. 'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'") (internal citations omitted). In the words of the *Purkett* Court, the trial court below made the mistake of collapsing "*Batson*'s second and third steps into one." *Id.* at 768.

Moreover, though *Purkett* was not decided until May 1995, more than two years after the conclusion of Petitioner's trial, the Indiana Supreme Court, by the time of its decision in August 1996, had not only ample opportunity, but also a mandate from the United States Supreme Court, to apply the law as articulated in *Purkett* in deciding Petitioner's appeal. *Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987) (holding that "failure to apply a newly declared

constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication"). Instead, with one reproachful eye fixed on the trial court's error (as evinced in its prospective ban on the use of this procedure), it upheld Petitioner's conviction and sentence with a wink of the other.[5] Thus did the district court properly determine that both the trial court conviction and sentence, and the state supreme court affirmance, rest on law that is inconsistent with (and therefore contrary to) federal law as articulated in *Batson* and *Purkett*.

Respondent contends that the trial court's jury selection procedure was constitutional under the *Batson* line of cases, which, Respondent reasons, collectively establish a *minimum standard* of constitutional protection from peremptory challenges motivated by racial discrimination. Thus, argues Respondent, to the extent that it deviated from the teachings of *Batson*, the trial court afforded Petitioner and prospective jurors a *greater* degree of constitutional protection

---

[5] The Indiana Supreme Court set forth the following "Rule for Future Cases":

> In exercise of our supervisory responsibilities, we adopt the following procedures for cases tried after the date this opinion is certified.
>
> We conclude that . . . absent extraordinary circumstances a trial court should not require each side to present a race-neutral justification for each of its peremptory challenges. Trial courts should wait for an objection by an opposing party before deciding whether a prima facie case of discrimination is made and demanding a race-neutral explanation. Intervention sua sponte is only authorized when a prima facie case is abundantly clear with respect to a particular juror. Obviously, a judge who adopts a blanket policy of demanding explanations, as the court did here, would not have articulated a particularized showing and would commit error.

*Williams*, 669 N.E.2d at 1381-82.

than *Batson* and subsequent relevant cases require. This argument implies that Petitioner somehow benefitted from the trial court's improvisation. We disagree, in part because we flatly reject the notion that *Batson* and its progeny merely delineate a constitutional baseline that a trial court might rightly surpass. Respondent's position is premised on the fiction that *Batson* claims supercede all other constitutional concerns or, alternatively, that *Batson*'s teachings exist in a vacuum. Quite to the contrary, the right to select or serve on a jury free from racial discrimination is rooted in the same constitutional equal protection and due process considerations as many other constitutional rights, each of which coexists in delicate balance with the others. As we now explain, the trial court's failed attempt to comport with *Batson* impermissibly upset that balance.

Rather than furnish Petitioner with superconstitutional protections, as Respondent would have us believe, the trial court's misapplication of *Batson* violated his Fourteenth Amendment due process and equal protection rights. Indiana law permits a criminal defendant to exercise twenty peremptory challenges in capital murder prosecutions. IND. CODE §§ 35-37-1-3(a). Yet, as early as the January 12, 1993, pretrial hearing, Petitioner's trial counsel identified the fatal flaw in the trial court's approach to peremptory challenges: "So what I'm hearing from the court is the peremptory challenges have now all been converted to challenges for cause?" Although the trial judge replied "Almost," during the pretrial hearing, the manner in which he conducted voir dire two weeks later betrays a resounding "Yes." Once the trial court imposed upon Petitioner the burden of overcoming its sua sponte presumption of purposeful discrimination, not only did it forego any cogent *Batson* analysis, but it also deprived Petitioner of his statutory right to exercise peremptory challenges. *Batson*, however, only imposes limitations on the exercise of peremptory challenges; it does not abolish them. *Batson*, 474 U.S. at 99

n. 22. Petitioner had a substantial and legitimate expecta-
tion that he would be tried by a jury selected in accordance
with Indiana state law and federal constitutional law, in-
cluding those provisions guaranteeing his right to exercise
peremptory challenges. Instead, Petitioner was deprived of
his liberty by a jury whose very creation involved a denial
of his statutory and constitutional rights. Consequently,
Petitioner was denied due process and equal protection of
the law in violation of the Fourteenth Amendment. *Cf.
Hicks v. Oklahoma*, 447 U.S. 343 (1980) (holding that denial
of a criminal defendant's right to be sentenced by a jury
in accordance with state law effected an arbitrary dep-
rivation of his liberty without due process of law).[6] Owing
to this violation of Petitioner's constitutional rights, it is
clear that the state trial court proceedings, and the state
supreme court review thereof, resulted in a decision
contrary to, and involving an unreasonable application of,
federal law as determined by the United States Supreme

---

[6] We are careful to note that today's decision is strictly limited
to the issues raised on appeal by the parties, and should not be
read to hold that (i) the Constitution provides a per se right to
peremptory challenges, (ii) the Constitution per se requires states
to adhere to their own rules of trial procedure, or (iii) the harm-
less-error doctrine is inapplicable. Here, the elimination of Peti-
tioner's state-constitutionally guaranteed right to peremptory
challenges resulted in their conversion to challenges for cause,
which the trial judge then denied *not* explicitly because they
appeared to be racially motivated, but rather because he was gen-
erally dissatisfied with Petitioner's stated reasons for challenging
(such as the lack of a record showing that a potential juror could
not give Petitioner a presumption of innocence, or the absence
from the record of a "good reason" for striking a potential juror).
The resulting denial of Petitioner's equal protection and due
process rights was not harmless (despite the Indiana Supreme
Court's adoption of a prospective prohibition of the trial court's
procedure, which seems to imply otherwise, *see Williams, supra*
note 5).

Court in *Batson* and its progeny. The district court therefore properly granted the petition for writ of habeas corpus.

## CONCLUSION

Because the trial court and the Indiana Supreme Court deviated significantly from the *Batson* line of cases with respect to selection of the jury that convicted Petitioner, and such deviation violated Petitioner's due process and equal protection rights under the Fourteenth Amendment, the district court's decision granting Petitioner habeas relief pursuant to 28 U.S.C. § 2254 is AFFIRMED.

A true Copy:
     Teste:

                          _____

                          *Clerk of the United States Court of*
                                 *Appeals for the Seventh Circuit*